Our sixth case up this morning is U.S. v. Davis, 21-3091. Good morning, Mr. Brangle. Good morning, Your Honor. You may proceed when you're ready, please. May it please the Court. The issue before the Court today is whether or not the District Court erred in overruling the defendant's motion to suppress where law enforcement agents did a protective sweep of a home without reasonable suspicion, without exigent circumstances to support that sweep, and without untainted consent for the sweep. I'd like to begin my comments by just pointing out a number of the cases that the government relies on in their written document before the Court. They're obviously present from this Court, but I think they're large and important distinctions between the instant case. Mr. Brangle, I'm sorry to interrupt you. Before you go too far down the cases, a quick question for you. Did anybody ever ask for a suppression hearing in this case? No, Your Honor. Because there aren't a lot of facts in the record, and these issues, especially attenuation, is often a very fact-dependent determination. I was surprised nobody asked for a hearing. Yes. In filing the motion, Your Honor, I think both parties, you know, I think Your Honor is aware that in support of my motion, I simply attached sort of police reports. I believe the government did the same thing. Yeah, you attached the same report. Yeah, and so it didn't seem to be any, at that point, big disagreement on the facts. So, I think that's probably, you know, that's why we didn't request a hearing, Your Honor. I think, I don't think that the issue before the Court would hinge on the facts that might have been developed. I think the facts as they are here support the suppression of the evidence. So, in the cases that the government cites… So, I'm going to ask you about a few facts, if I could, please. I'm interrupting you again, I'm sorry. Okay, it's fine. Is, Ms. Ewing Jimerson consented to the search of her home, and she gave voluntary consent, and you haven't contested the voluntariness of that. When, do we know if she gave that consent when she was inside of her home or outside of her home? I don't think we know that, Your Honor. Do we know if she saw your client handcuffed before she gave that consent? I don't think we know that for sure. Do we know how many officers were on the scene at her home that she did see before she signed the consent? No, I would just, I would like to add something on that point. In the police report, Your Honor, it is undisputed that there were, at the outset, enough officers to make a perimeter around the residence? Correct, but I didn't see anything that made clear when she came, 45 minutes after they arrested him, who was still outside, who she saw. And one more significant factual question. Do we know if Ms. Ewing Jimerson was aware that a search had been conducted at her home, and they found a firearm before she gave voluntary consent? I think we do, Your Honor. How do we know that? I did not see that anywhere in the report. We know that she knew at some point, but I didn't see in the report where she was informed before she gave consent that a firearm had been found. Well, Your Honor, my memory might be mistaken. I thought in the initial report, there was a comment from the officer that said that he had explained to her that they found those items and he wanted her consent. I might not be remembering it correctly, but I do think that we know that. She was advised they had found them, but I don't see it connected to the second part there, that she was advised they found it, and that's why they wanted her consent. They talked to her about a handgun, but anyway, go ahead with your argument. Okay, thank you, Your Honor. So, all the cases that the government cites, except for one, involve a protective sweep that occurs almost immediately after the alleged criminal conduct, or very close in time. The only case that doesn't have that scenario is Tapia. In Tapia, I believe the situation is they're coming to arrest Mr. Tapia sometime afterwards after the alleged criminal conduct, but the officers coming have knowledge that Mr. Tapia is alleged to have been doing crime with other people, and this is a drug case and potentially a drug conspiracy, and the individuals have been using that location as a place of meeting. Here, there are no facts like that. This is not a case where Mr. Davis is alleged to have done his criminal conduct with other people, and there's no allegation that his criminal conduct is attached to this location. So I think that's a fairly significant distinction between a lot of the cases that have presented themselves to this court previously. So, one case, the Henderson case, there are potentially multiple people involved in the crime. It's a little bit unclear, but the crime had just happened, and it's not clear how many people were involved, as I remember the Henderson situation. How long before the police officers went in? They arrested your client, and then they went in to do a protective sweep. How long after the arrest did they go in to do the sweep? Yes, Your Honor. I believe it's undisputed that that length of time is approximately 45 minutes. Wait, no, no, no. Wait, wait. The 45 minutes is the consent. Oh, yes. I apologize, Your Honor. You're right. I'm sorry. I misspoke. Your question was how long between their confrontation with Mr. Davis and when they went into the home. Right. They arrest him, they put him in handcuffs, and then they go into the home. How long after? I don't think we know that exactly, Your Honor. My reading of the report led me to believe that it was nearly, you know, directly after. Simultaneously. Yes, simultaneously. Because I thought you were making the argument that they took too long to go into the home, and I thought, boy, that's a good argument. But I don't think that exists here. No, I agree. No, Your Honor, and that's not what I was intending to argue, and I'm sorry if I was not clear. So what I was arguing was that so the marshals are here at Mr. Davis's home because he's suspected of being involved in a shooting sometime prior, not on this day. Right. And so a lot of the cases that have been presented to this court are situations where law enforcement, they're investigating things that are ongoing, like the Contreras case where they're observing a drug deal. And in the Thompson case where they're kind of, again, in the midst of a drug investigation, that's not what's happening here. The marshals are simply coming to arrest Mr. Davis because he's suspected of doing a shooting on a different day at a different place, and it's not connected to this home. You're into your rebuttal time, Mr. Pringle, if you want to say something. Thank you. I'd like to reserve the rest of my time. Thank you, Your Honor. Thank you. Mr. Dean. Good morning. May it please the court. David Dean on behalf of the FLE, the United States of America. District Court found that the officer's warrantless entry in this case was justified on three separate and independently sufficient grounds. Protective sweep, exigent circumstances, and the homeowner's subsequent consent to search. Importantly, this court can affirm if they agree with Judge McGlynn on any one of those three bases. But in fact, district court got it right on all three points. Mr. Dean, I'm going to ask you the same question about the record. On the attenuation point, do we have a sufficiently developed record to make that determination, given we know, and it's uncontested, Ms. Ewing Jimmerson gave a voluntary consent to search her home roughly 45 minutes after Mr. Davis was arrested. But the report that's been submitted by both sides in the record doesn't give facts about what she knew at the time, if she knew there had been a search, if she saw Mr. Davis in handcuffs. It doesn't give any of those extra facts. Why is the record sufficient without those facts around what she knew when to make an attenuation determination? I think the reason that the record is sufficient, Your Honor, is because of what this court has designated as the most important of the factors when gauging attenuation, and that is the purpose or flagrancy of the official misconduct. Given the fact that the officers operate, and this is an express factual finding of the district court, Your Honor, that the officer did not make any intentional violation of the Fourth Amendment, rather the purpose of their sweep was to ensure the safety of the officers and the children that they knew were inside. In the Conrad case, this court said that the third factor in the rebellious Ortega, the purpose of flagrancy is the most important factor because it goes to the heart and reason for the underlying exclusionary rule. What happens if we don't find that there was enough for a determination of a protective sweep? What happens if that third factor doesn't have the same weight that you're placing on it, or that there was sufficient evidence for exigent circumstances based on the record? If there was a valid protective sweep or exigent circumstances, Your Honor, then there was no illegality in the first place, and so there's no need. I'm sorry. I said just the opposite, and maybe I wasn't clear. Sorry. I'm sorry. I'm sorry. If we disagree, and I would agree with you that if there was a protective sweep or exigent circumstances, it would be different. But what if we disagree that the evidence developed on the record was sufficient for a protective sweep or exigent circumstances? Turning then to attenuation, you can't rely on those for the purpose or flagrancy of the conduct. Well, Your Honor, I still think there would be a question of the officer's state of mind. I think that's what's meant by purpose and flagrancy of the conduct. That factor presumes a constitutional violation, but the question is whether it was purposeful, whether it was flagrant. And so even if the officers made a miscalculation, if, say, they only had two specific and articulable facts and they needed three to justify a protective sweep, the district court expressly found that they didn't intentionally violate the Fourth Amendment. Their conduct was not flagrant, and thus, you know, the purposes underlying the exclusionary rule, I don't see that there'll be any salutary deterrent effect by excluding the evidence in this case. And I think that that's built into the Robillus Ortega test by making that third factor the most important. At the very least, Your Honor, as the district court found, the officers thought they were operating in good faith. They thought there was a valid protective sweep. They thought they had an extra circumstances. If that was wrong, I don't think that that means that that makes the conduct flagrant, even if it was, in fact, a constitutional violation. But if I may, Your Honor, there was a valid protective sweep in this case because the officers did have specific and articulable facts, justifying a reasonable suspicion that that the that the house may include how someone that was posing a danger to the officers. First, the officers knew that there were still people inside the house. That's because when they arrested Mr. Davis, he told them that children of an unspecified age and number were still inside. Second, because of a pre-arrest briefing, the officers knew that Mr. Davis was wanted in connection with a shooting for which he'd been charged with three counts of aggravated battery. So, in other words, the officers arrived on scene with knowledge that Mr. Davis was potentially armed and dangerous. And then when they arrested him, they learned a third piece of important information, not being that the gun was not found on this person. And so that supported a reasonable and a prudent inference on the officer's part. The gun could still be somewhere inside, coupled with the information that people were inside. Your Honor, I think that supports a reasonable inference that an armed and dangerous individual could be inside the house. This is essentially the same inference that this court previously upheld in the Henderson case. And I'd like to briefly respond to Mr. Davis' question. I think it's important to note that this particular case set up by the government includes an active crime scene or a place where active criminal activity was known to be the case. That's not true, Your Honor. And the Burroughs case presented a situation very similar to this one, where the officers knew that the person they were wanted on an arrest warrant had committed a prior shooting and was involved in violent prior criminal activity. But there's no knowledge that there was any ongoing criminal activity in the house. And yet the protective suite was justified in that case, even after both of the suspects have been arrested. That's very comparable, I think, to the current situation in the present case, Your Honor. So, not only, the second ground on which the district court upheld the entry, of course, was extant circumstances, Your Honor. The district court found that after they arrested Mr. Davis and he told them there were children inside, at least to the officer's knowledge, that left an unknown number of children completely unattended inside the residence. Why didn't they ask, by the way? I mean, you know, I have a problem with this. Who's in the house children? And so they go in. I mean, there's a big difference between a 16-year-old girl taking a shower and a two-year-old making macaroni and cheese. Right? You see what I mean? Like, who's in the house children? How old are they? Are they unattended? I think that's a good question, Your Honor, and I think a related question is why didn't they knock and announce? If it was a question of extant circumstances and children were inside, why didn't they at least knock? I think that points out the difficulty and, in a sense, the artificiality in trying to analyze these two strains of protective sweep and extant circumstances in isolation when, in fact, they were very much happening at the same time. The officers, once they knew the children were inside and they knew a gun was possibly on the premises, they were concerned both for the officer's safety and potentially for the safety of the children. For example, if they were very young children, then the gun may pose a danger to them. You know, as pointed out in the government's brief, this court has recognized that when law enforcement officers arrest the adult having custody of a child, they have a constitutional duty to ensure the safety of the child. And so once Mr. Davis told them that there were children inside and they arrested him, from that moment, at a minimum, the officers had an obligation, a constitutional obligation, to ensure that children were safe from immediate hazards. Now, Mr. Davis has argued on appeal that the officers had no specific information that there was any immediate danger, but I think that leaves unanswered the question of what the officers were supposed to do with that information. They certainly couldn't simply pile Mr. Davis into a squad car and drive away. Given all the circumstances, the entry just to conduct a welfare check, make sure the children were okay, seems to be justified by exigent circumstances in this case. Why didn't they ask Mr. Davis for consent to search the house? For consent? Yes. Well, by that point, Your Honor, he'd been placed under a completely lawful arrest. And this court has previously said that when someone is taken away for purposes of a valid arrest, their absence is in the same place of any person absent for any other reason. In other words, we don't look into the subjective reason of why he wasn't there, but rather whether or not his absence was objective based on an arrest. So when the officers asked Ms. Ewing-Jimerson for her consent in the kitchen of the house, Mr. Davis was not present. He was not present because of an arrest. And so, honestly, the question of their subjective intent of why they didn't is not something that I think the law recognizes. And can you refresh my recollection? In the incident report, I didn't see where the police knew he had been linked to a shooting. Where do we have that in the record? I don't doubt that there was a marshal's briefing and they knew that. Where is that in the record? That's not in the police report, Your Honor. That's evidence that the government proffered at the time of the motion in the lower court. And in the appellant's brief, that fact has actually been conceded. The appellant's brief notes that that fact actually had occurred. I see that I'm essentially out of time. So for all these reasons, the government would request that the judgment of the district court be affirmed. Thank you. Thank you, Mr. Dean. Mr. Frankel, rebuttal, please. Thank you, Your Honor. Maybe a better way to talk about the cases the government cited was to say that they relied on those cases heavily. But the cases I pointed out to the court earlier I thought were cases that were prominently used in the government's brief. To the extent that the Burroughs case doesn't match with those, I do think the bulk of the cases presented to this court represent situations where there was sort of an ongoing investigation. Or if there wasn't, as in the Tapia case, there were specific facts that Mr. Tapia was using that residence with other people. With respect to the government's conduct on dangerousness to the officers, you know, the marshals go up and they arrest Mr. Davis. To the extent that Mr. Davis would pose any danger to the officers, that danger is subsided. I do not think it's reasonable to assume that they didn't have to go into the house. They could simply take Mr. Davis away and make themselves safe. Well, they weren't worried about Mr. Davis. Yes, Your Honor, but I am simply saying that they could remove themselves from the situation, potentially. The other thing I would just like to say, I'm running out of time. The government seemed to suggest that, well, because there's children there, the law enforcement can't just do nothing. Well, maybe, but it doesn't follow that they must go into the house, as Your Honor has suggested, I think, correctly. There are other steps they could have taken, short of going into the house, to ensure safety of those children. Like asking Mr. Davis, how old are those children? Is there some sort of danger to them? Can we call their mother? Just because there's information that there's children there doesn't mean they must do a sweep of the house. So, I wanted to just point that out. So, if there are no more questions from the Court, I think I will probably conclude my comments. Thank you. Thank you, Mr. Brangle. Thanks to both counsel. We will take the case under advisement. And that's our last case for court this morning. Court is in recess.